# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

**UNITED STATES OF AMERICA,**
    *Plaintiff*,

v.                                                                 **No. SA-23-CR-637-JKP**

**MICHAEL CHARLES MOORE,**
    *Defendant*.

## ORDER DENYING MOTION TO SUPPRESS

Before the Court is Defendant Michael Chares Moore's Motion to Suppress Evidence (ECF No. 34). The Government has filed a response (ECF No. 39). On November 19, 2024, the Court conducted a hearing on the motion. The Court admitted and considered all evidence submitted by the parties for the purpose of resolving the motion.[1] For the reasons set forth below, the Court DENIES the motion.

## I. BACKGROUND

On December 13, 2023, a grand jury indicted Defendant on one count of False Statement Made in Connection with the Acquisition of Firearms, in violation of 18 U.S.C. § 922(a)(6). *See* ECF No. 15. The Government alleges Defendant made false statements on the ATF Form 4473 he completed on November 21, 2023, to purchase a .50 caliber rifle. ECF No. 39 at 2.

---

[1] The Defense presented the following exhibits from information obtained through discovery produced by the Government: (1) two audio recordings of Government agents' conversations with the Defendant on November 30, 2023, (the first conversation occurred in an overflow parking area adjacent to a store of a federal firearms licensee ("FFL"), and the second conversation occurred at the agents' offices in San Antonio); (2) transcripts of these conversations were marked as Defendant's Exhibit ("DE") 1-A (first conversation) and DE 2-A (second conversation); (3) a Department of Commerce, Bureau of Industry and Security BIS Form 7008TF Office of Export Enforcement Warning and Waiver of Rights (marked as DE 1); (4) a screenshot of Defendant's phone with the name "Bebo" displayed on the screen (marked as DE 2); (5) a second screenshot of Defendant's phone with a text message between Defendant and "Bebo" which included the name and address of the FFL store (marked as DE 3); (5) a third screenshot of Defendant's phone with text messages between the Defendant and "Bebo" (marked as DE 4); (6) a fourth screenshot of Defendant's phone displaying a missed call (marked as DE 5); and (7) a short video depicting Defendant at the counter of the FFL store prior to his encounter with agents on November 30, 2023, (there is no sound for the video). The Government provided the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ATF Form 4473 which was completed by Defendant as part of his purchase of the weapon that is the subject of this criminal case.

Defendant contacted the firearms dealer or federal firearms licensee ("FFL") on November 17, 2023, using a phone number associated with another person to inquire about purchasing the .50 caliber rifle. *Id*. Defendant visited the FFL on November 20, 2023, and tried to purchase the rifle. *Id*. The sale was not completed because the FFL determined Defendant's Texas identification card was damaged. *Id*. FFL employees noticed Defendant was driven to the store by a man operating a silver Dodge ram pickup truck. *Id*. This unidentified man accompanied Defendant into the store. *Id*. Agents confirmed the unidentified male owned the silver Dodge Ram pickup truck. *Id*. Defendant returned to the FFL on November 21, 2023, and was accompanied by the same unidentified male. *Id*. Defendant showed FFL employees a receipt from the Texas Department of Public Safety which demonstrated his identification card was validated. *Id*. The unidentified male paid for Defendant's identification card to be validated. *Id*. On November 21, 2023, Defendant completed the ATF Form 4473, and stated he was the actual buyer/transferee of the rifle. *Id*. at 3. After his identification was verified, Defendant paid $10,500.24 in cash to FFL employees for the rifle. *Id*.

On November 30, 2023, Defendant returned to the FFL to pick up or take possession of the rifle. *Id*. The unidentified male accompanied Defendant into the store. *Id*. Defendant and the unidentified male left the FFL while store employees were finalizing paperwork for the sale. *Id*. Defendant returned alone to the FFL about one hour later in the silver Dodge Ram. *Id*. During the intervening period, federal agents set up surveillance at or near the FFL. *Id*. Agents saw the Defendant speaking on his cell phone prior to entering the FFL. *Id*. Agents confronted Defendant after he left the FFL with the rifle and began to question him regarding the purchase of the rifle. *Id*.

Special Agent Jason Glance ("SA Glance") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") testified at the hearing. He testified that ATF agents were aware of the

following facts prior to the agents' interaction with the Defendant on November 30. 2023:

(1) on November 17, 2023, Defendant called the FFL to inquire about the Barrett .50 caliber rifle;

(2) SA Glance used a law enforcement database and learned the caller identification number associated with the phone Defendant used to call the FFL belonged to Ramon Flores ("Flores");

(3) on November 20, 2023, at approximately 6:25 p.m., the FFL contacted ATF agents to inform them that Defendant was inside the store asking about a Barrett rifle;

(4) Flores drove Defendant to the FFL in a silver Dodge Ram pickup truck;

(5) Flores owns a silver 2019 Dodge Ram pickup truck which is registered with the state of Texas with a San Antonio address that matches the address on his driver's license;

(6) Defendant attempted to purchase the Barrett rifle using his Texas identification card, but the FFL refused the sale because the identification was damaged;

(7) the address listed on Defendant's identification card was 2500 Jackson Keller in San Antonio;

(8) on Tuesday, November 21, 2023, at approximately 3:35 p.m., the FFL informed ATF agents that Defendant returned to the store to purchase the rifle;

(9) Defendant arrived at the FFL as a passenger in Flores's silver Dodge Ram pickup truck;

(10) Defendant provided the FFL a receipt from the Texas Department of Safety ("Texas DPS") which demonstrated payment for a new (undamaged) Texas identification card;

(11) the receipt Defendant provided to the FFL reflects that Flores paid for the transaction which allowed Defendant to obtain the new (undamaged) identification card;

(12) after Defendant completed the ATF Form 4473, the FFL contacted ATF because Defendant paid cash in the amount of $10,500.24 for the rifle;

(13) the FFL offered Defendant a "layaway" option to pay for the rifle;

(14) On November 30, 2023, at approximately 3:00 p.m., ATF agents set up surveillance at the FFL and observed Defendant driving Flores's silver pickup truck;

(15) ATF agents approached Defendant when he exited the FFL and asked to speak with him.

H'rg Tr. 64:19-77:18.

## II. FOURTH AMENDMENT

The Fourth Amendment protects against unlawful searches and seizures by the

Government, and "its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Because officers arrested Defendant without a warrant, the Government bears the burden of proving by a preponderance of the evidence that the arrest complied with the Fourth Amendment. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 56 (2018) (quoting *Payton v. New York*, 445 U.S. 573, 585, (1980)). Consistent with this Amendment an arrest must be "supported by probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

"In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Id.* Probable cause justifies an arrest when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). An officer's personal knowledge as well as "reasonably trustworthy information" known to the officer may both support a finding of probable cause. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009); *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964); *Grisham v. Valenciano*, 93 F.4th 903, 908 (5th Cir. 2024); *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003). "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing the law in the community's protection.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)

4

(quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. Courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 583 U.S. at 56-57 (citation and internal quotation marks omitted). In other words, when determining the existence of probable cause, courts consider "the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest." *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006).

While the existence of probable cause "depends on the totality of the circumstances," its core substance "is a reasonable ground for belief of guilt and that belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371 (citations and internal quotation marks omitted). "It requires not merely a reasonable suspicion that a crime has been committed, but a reasonable basis under the circumstances for reaching that conclusion and for acting on it." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988). Additionally, "while law enforcement personnel 'may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.'" *Evett*, 330 F.3d at 688 (quoting *Bigford*, 834 F.2d at 1218).

Whether probable cause exists is a "common-sense decision" based on "all of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). It "requires "'a fair probability' that a suspect has committed a crime." *United States v. Bass*, 996 F.3d 729, 737 (5th Cir. 2021) (quoting *Gates*, 462 U.S. at 238). An officer's subjective determinations are not considered in analyzing whether probable cause exists because "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck,* 543 U.S. at 153 (citing

5

*Whren v. United States,* 517 U.S. 806, 812–813 (1996)). "The Fifth Circuit has further defined the probable cause inquiry to require that an officer ***reasonably*** and honestly believed facts which would cause a prudent person to believe there is a fair probability that the suspect committed a crime." *Camacho v. United States*, 116 F. Supp. 3d 762, 786-87 (W.D. Tex. 2015) (adding emphasis and citing *Gordy v. Burns*, 294 F.3d 722, 729 (5th Cir. 2002)).[2] "Probable cause turns only on whether, objectively, considering the totality of such circumstances, a prudent person would believe there is a fair probability that the suspect committed a crime." *Id*. at 787.

> The test for probable cause does not involve speculation about the outcome of a trial on the merits of a particular charge, but rather upon an assessment of whether the knowledge of the arresting officer at the time of the arrest would be sufficient to warrant a prudent man's believing that the person arrested had committed or was committing an offense.

*United States v. Bertram*, 719 F.2d 735, 737–38 (5th Cir. 1983) (citing *United States v. Atkinson,* 450 F.2d 835, 838 (5th Cir. 1971). While "the evidence sufficient for probable cause must be more than what amounts to a mere suspicion, it is considerably less than what is required for a conviction of guilt." *Id*.

Probable cause is "a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules," because it "deals with probabilities and depends on the totality of the circumstances." *Wesby*, 583 U.S. at 57 (citations and internal quotation marks omitted). These "are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Adams v. Williams,* 407 U.S. 143, 149 (1972) (quoting *Brinegar,* 338 U.S. at 175). Probable cause is satisfied with less than "an actual showing of" criminal activity—it only requires "a probability or substantial chance of criminal activity," which "is not a high bar." *Wesby*, 583 U.S. at 57 (citations omitted).

---

[2] Although *Gordy* was abrogated and overruled on other grounds by *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003), *Castellano* itself was later overruled by *Thompson v. Clark*, 596 U.S. 36 (2022). *See Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023). *Gordy* has thus been reinstated. *See id.*

### III. DISCUSSION

**A. Early Law Enforcement Interaction on November 30, 2023**

Defense Exhibit 1-A is a transcription of the audio recording of the conversation between Government agents and the Defendant that occurred on November 30, 2023. ECF No. 34-2. The Court will identify and cite this document as DE 1-A. This conversation lasted approximately fifty-five minutes. This initial interaction between agents and the Defendant was an encounter, which does not trigger the protections available under the Fourth Amendment.

Agent Eric Schuler began questioning Defendant about the purchase of the firearm. DE 1-A 2:3-9:17 (showing an agent named "Will" from the Bureau of Industry and Security took over questioning Defendant).[3] Defendant told agents he worked as a contractor providing flooring services. *Id*. 3:4-10. Defendant stated that he owned a couple of pistols in the past, but he does not own them anymore. *Id*. 3:11-19. He said he was interested in purchasing shotguns. *Id*. 3:18-19. He stated he did not know a lot about guns, earned an hourly wage, lives in San Antonio, and was twenty-eight years old. *Id*. 3:16-4:12.

Agents informed Defendant that his purchase generated a red flag. *Id*. 5:11-13. Defendant told agents that his brother-in-law, "Ramon," had accompanied him to the store. *Id*. 5:15-19. In response to the agent's question regarding the type of firearm purchased, Defendant stated the weapon was a "Barrette." *Id*. 6:2-5. Defendant stated he was familiar with how the gun worked based on the movie "Smokin' Aces." *Id*. 6:6-13. Agents informed Defendant of their concern about the truthfulness of his statements concerning the purchase of the rifle. *Id*. 6:16-25. Defendant stated he bought the rifle for himself. *Id*. 7:20-21. Agents informed Defendant about the consequences of lying to federal agents under 18 U.S.C. § 1001. *Id*. 8:3-9:2. Agent Schuler stated:

But right now, I'm –telling you that we know that this gun is not being purchased

---

[3] "Will" is Special Agent William Moss of the U.S. Department of Commerce, Bureau of Industry and Security. DE 2-A 2:9-10.

for you. And that $10,000 cash is not for you. I also know that if you walk out of here without that gun or without that $10,000 cash, someone is going to be upset. Okay? And I'm telling you it's not going to happen, unless we know what's going on.

*Id.* 8:21-9:2.

The Defense argues Defendant was detained at this point without reasonable suspicion because Agent Schuler told Defendant that he was not free to leave unless Defendant provided more information about the actual purchase of the rifle. The Government argues the Defendant was not detained and was free to leave, but without the rifle or the cash used to purchase the rifle. After additional conversation, agents informed Defendant he was being detained and they were going to take him back to their offices to continue the discussion. *Id.* 22:24-23:1. The Government concedes that the Defendant was arrested at this point.

The Court concludes that agents had probable cause to conduct a warrantless arrest prior to their November 30, 2023, interaction with Defendant. Therefore, whether Defendant was detained when Agent Schuler may have indicated Defendant would not be able to leave "unless we know what's going on" is irrelevant because probable cause existed prior to the November 30, 2023, conversation. As explained earlier, the FFL contacted agents twice regarding the suspicious circumstances surrounding Defendant's purchase of the rifle. Agents were aware Defendant's first attempt to purchase the rifle failed because his Texas identification card was damaged, and he was required to correct the issue through the Texas Department of Public Safety. The address on the damaged identification card did not match the address on the new identification card. Agents knew that Flores paid the fee to the Texas Department of Public Safety for a new identification card. Agents also knew Defendant called the FFL using a phone number issued to Flores to inquire about the rifle. Flores drove Defendant to the FFL on several occasions and was present with Defendant in the store on at least one occasion. Agents knew Defendant filled out the ATF Form 4473, and stated he was the actual transferee/buyer of the rifle. Agents knew Defendant paid cash for the

8

rifle. Agents were aware of all of this information prior to their November 30, 2023, interaction with Defendant.

During their conversation with Defendant on November 30th, agents learned Defendant was a 28-year-old hourly wage-earning flooring contractor who did not own many guns in the past (and none at the time of the purchase that is the subject of this case). Defendant pronounced the name of the rifle incorrectly, and stated he was going to purchase .50 caliber ammunition for the rifle from a range that he called, but he could not remember the name of the establishment. These facts establish additional support for the existence of probable cause prior to any argument that Defendant was detained when Agent Schuler commented that Defendant was not leaving the scene unless he provided an explanation.

Prior to arresting Defendant, agents took possession of several items that belonged to Defendant. A cold reading of the transcript (Exhibit DE 1-A 21:2-23:14) shows that agents seized Defendant's personal property well in advance of the decision to arrest him. Agents took Defendant's knife out of his pocket, they took the keys to Ramon Flores's truck, and they took his cellular phone. They appear to be seizing his property (or property that he has been entrusted in the case of the keys to Ramon Flores's truck). Review of the audio version of this portion of the conversation demonstrates the agents are in the process of arresting Defendant. *See* DE 1 (the audio) 19:30-21:35. During the drive from the FFL store to the agents' offices, the agents and Defendant engaged in conversation that was unrelated to the alleged straw purchasing offense.

**B. Interrogation at the ATF Office**

After arriving at the ATF San Antonio office, SA William Moss reads Defendant his Miranda rights at approximately 6:44 p.m. on November 30, 2023. DE 2-A 2:19-3:13. SA Moss asked Defendant if he wanted to speak with the agents present in the room, and he responded "Yeah." *Id.* 3:21-22. Present in the room with SA Moss was, ATF special agents Eric Schuler, SA

James Gibson, SA Jason Glance, and San Antonio Police Detective Saenz. *Id*. at 2:12-18. Then, Defendant stated "I never said I was willing to speak." *Id*. 4:2. Defendant stated he has a family, which apparently is a concern he expressed regarding his willingness or unwillingness to speak to the agents. *Id*. 4:4-5. Defendant said: "Yeah, I'll talk to y'all but I can't give y'all . . . You know what I'm saying." *Id*. 8:11-14. Defendant signs the rights waiver form at 7:11 p.m. on November 23, 2023. *Id*. 29:19-24.

"Under the Fifth Amendment, no person shall be 'compelled in any criminal case to be a witness against himself.'" *United States v. Clayton*, 98 F.4th 256, 264 (5th Cir. 2024) (quoting U.S. Const. amend. V). The Supreme Court has recognized that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Such an individual "must be warned prior to any questioning that he has the right to remain silent." *Id.* at 479; *accord Clayton*, 98 F.4th at 264; *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). An incriminating statement made by a suspect during custodial interrogation, but prior to receiving warnings required by *Miranda* are generally inadmissible. *Missouri v. Seibert*, 542 U.S. 600, 604, 608–09 (2004). *Miranda* requires procedural safeguards "to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored." 384 U.S. at 479.

There is no dispute that Defendant was in custody and there is no dispute that Agent Moss read the required warnings to Defendant before the agents began interrogating him. The core question here is whether Defendant unambiguously invoked his right to remain silent. After Agent Moss read the Miranda warnings to Defendant and asked him if he would be willing to speak with the agents, Defendant responded "[y]eah." DE 2-A 3:22. Immediately after Defendant indicated he would speak with the agents, Agent Moss presented the warning and waiver form for Defendant

to sign to memorialize Defendant's willingness to speak. *Id*. 3:23-4:1. When Agent Moss presented the form to Defendant, he stated "I never said I was willing to speak." *Id*. 4:2. This response appeared to cause some confusion based upon Defendant's prior statement that indicated he would speak to the agents. Agents Moss continued to speak with the Defendant to explain the trouble Defendant might face resulting from the purchase of the rifle. Defendant stated, "I've got a family bro." *Id*. 4:4-5.

Agent Moss restated his desire to speak with Defendant about the purchase of the rifle, but also informed Defendant that he did not have to talk to the agents. Agent Moss stated:

> Like he said, at any point in time you can decide to not talk to us. Right? Like if you decide to talk to us now, at any point in time you can stop. Q. Or say you don't want to talk about that specific thing. Q. Right. Or you -- or you can say: I don't want to talk about that. Ask me the next one. Okay? You can do that as well.

*Id*. 6:16-23 (no answers were given to any of these questions). Agent Moss also stated,

> I mean, we're going to do our jobs, period, no matter what, regardless of how this conversation goes. But we're not going to go to bat for someone that's not going to help us out. Okay? And that's kind of where we're at. I spoke to a U.S. attorney on the way here. They're waiting for a response. Well, besides any of that, the bottom line is do you want -- do you want to talk to us for a minute here and see where -- where -- where we're kind of at?

*Id*. 8:1-10. Defendant responded: "Yeah, I'll talk to y'all but I can't give y'all . . . You know what I'm saying." *Id*. 8:10-11. Defendant ultimately made an incriminating statement. He stated "[t]hat's basically what it was. He wanted me to get a gun for him and he couldn't get it." *Id*. 17:2-3. Defendant signed the rights waiver form much later into the interrogation. *Id*. 29:19-24.

A suspect invoking his right to remain silent must be unambiguous and unequivocal. *Berghuis*, 560 U.S. at 380–82. A suspect wishing to exercise his right to remain silent and "cut off questioning" must either "say that he want[s] to remain silent or that he [does] not want to talk with the police." *Id.* at 382. If a suspect makes "either of these simple, unambiguous statements," he has "invoked his 'right to cut off questioning." *Id*. Further, making any "similar 'simple,

11

unambiguous statement," may "properly exercise [the] right to remain silent and 'cut off questioning.'" *Clayton*, 98 F.4th at 265. The evidence presented to the Court does not reflect that Defendant made any simple, unambiguous statement invoking his right to remain silent.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant's Motion to Suppress (ECF No. 34).

It is so ORDERED.

SIGNED this 2nd day of December 2024.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE